## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

PHARMACEUTICAL CARE
MANAGEMENT ASSOCIATION,

     *Plaintiff*,

vs.

MARLIN BLANE, MELISSA BORUFF,
DAVID BROWN, JAKE BYNUM,
NICHOLE FOSTER, REBECCA LEINART,
SHANEA MCKINNEY, BROOKE MILLS,
MATTHEW PHILLIPS, LUCY SHELL,
AND JONATHAN SKRMETTI, *each in his
or her official capacity*,

     *Defendants*.

Case No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Michael B. Kimberly*
Linda M. Blair*
WINSTON TAYLOR LLP
1901 L Street NW
Washington, DC 20036
(202) 282-5096
michael.kimberly@winstontaylor.com
linda.blair@winstontaylor.com

Nathaniel R. Lee*
WINSTON TAYLOR LLP
2121 North Pearl Street, Suite 900
Dallas, Texas 75201
(214) 453-6500
nathan.lee@winstontaylor.com

* *pro hac vice* motion forthcoming

Todd Presnell
Timothy A. Rodriguez
BRADLEY ARANT
  BOULT CUMMINGS LLP
1221 Broadway
Suite 2400
Nashville, TN 37203
(615) 252-2355
tpresnell@bradley.com
trodriguez@bradley.com

Plaintiff the Pharmaceutical Care Management Association (PCMA) brings this complaint against Marlin Blane, Melissa Boruff, David Brown, Jake Bynum, Nichole Foster, Rebecca Leinart, Shanea McKinney, Brooke Mills, Matthew Phillips, Lucy Shell, and Jonathan Skrmetti, each in his or her official capacity, and alleges as follows.

**TABLE OF CONTENTS**

Introduction ..................................................................................................... 2

Parties ............................................................................................................. 6

Cause of Action, Jurisdiction, and Venue....................................................... 7

Standing .......................................................................................................... 8

Factual Allegations.......................................................................................... 9

    A.   PBMs play an indispensable role in administering prescription drug benefits and keeping drugs affordable................................................. 9

    B.   The Act requires pharmacies affiliated with PBMs and health insurance companies to disaffiliate or cease in-state operations........................ 13

    C.   In both purpose and effect, the Act favors local businesses and discriminates against competition by out-of-state businesses ........................... 16

Causes of Action ............................................................................................ 20

    Count 1: Commerce Clause Violation.................................................... 20

    Count 2: ERISA Preemption .................................................................. 24

    Count 3: Medicare Preemption.............................................................. 27

Prayer for Relief............................................................................................. 30

1

1.     Pharmacy benefits managers (PBMs) play a vital role in helping to contain the ballooning costs of prescription drugs. Nearly all prescription drug purchases in America are covered by some form of insurance. Such insurance may be offered as a fringe benefit sponsored by an employer or union, or as a public benefit furnished under a federal benefit program like Medicare or TRICARE. No matter the case, the task of designing and administering these prescription-drug benefits is stunningly complex. A benefit sponsor must (among other things) identify which drugs should be covered; determine how costs should be shared between the plan and its participants; negotiate with manufacturers and wholesalers over drug pricing and rebates; contract with thousands of "in network" pharmacies and negotiate how they will be reimbursed; develop a system for processing countless claims instantaneously at the point of sale; and provide for legally mandated notices, appeal procedures, and myriad other administrative requirements and tasks.

2.     The resulting administrative burden is prohibitive for almost all sponsors of prescription drug benefit plans, both public and private. Sponsors thus almost always turn to PBMs to help them design and administer their benefits.

3.     To improve economies of scale and achieve other efficiencies including elimination of third-party markups and improved coordination of care, PBMs commonly own or affiliate with their own retail, mail-order, and specialty pharmacies. To keep prescription-drug costs low, prescription-drug benefit plans typically adopt favorable cost-sharing terms to encourage plan enrollees to use PBM-affiliated pharmacies, which means better health outcomes for patients at lower costs to plan sponsors.

4.     Independent pharmacies sometimes find it challenging to compete with PBM-affiliated pharmacies, because independent pharmacies are typically unable to

2

achieve the same efficiencies and health benefits. Rather than innovating in an attempt to compete on price and quality of service, independent pharmacies in Tennessee turned to the General Assembly to simply bar out-of-state, PBM-affiliated competitors from the market. The General Assembly abided, recently passing the FAIR Rx Act. The Act imposes an outright ban on the operation of pharmacies affiliated with PBMs and health insurance issuers in the State.

5. If it is allowed to take effect, the Act's impacts will be devastating. It will force pharmacies affiliated with out-of-state PBMs and health insurance issuers to close, divest, relocate, or relinquish Tennessee operating authority. CVS alone holds more than 150 resident and non-resident Tennessee pharmacy licenses, operates 134 retail pharmacies and two specialty pharmacies in Tennessee, and provides mail-order pharmacy services to Tennesseans through pharmacies located outside the State. Express Scripts Pharmacy and ESI Mail Pharmacy Service are national mail-order pharmacies that delivered more than 2 million prescriptions to over 147,000 patients throughout Tennessee in 2025 alone. The Act will bar out-of-state mail-order and specialty pharmacies from dispensing millions of prescriptions annually to Tennesseans if the pharmacies are affiliated with both a PBM and a health insurance issuer, as many are.

6. PCMA has over seventy members, including Abarca Health, CarelonRx, CerpassRx, CVS, Express Scripts, Humana Pharmacy Solutions, LucyRx, Maxor Plus, MedImpact Healthcare Systems, Navitus, OptumRx, PerformRx, Prime Therapeutics, ProAct, Progyny, Rx Benefits, RxPact, RxSense, Script Care, Serve You Rx, TrueRx, Vytlone, Waltz Health, and WellDyne.

7. Many of PCMA's members, including CVS, Express Scripts, and OptumRx, will be directly impacted by the Act. CVS alone employs over 6,000 Tennesseans, serves

3

nearly 1.5 million Tennesseans, and filled approximately 26 million prescriptions in the State in 2025. Express Scripts employs more than 4,000 Tennesseans through Accredo, which last year dispensed more than 2.3 million prescriptions nationwide, including more than 128,000 prescriptions to nearly 26,000 patients in Tennessee. Accredo's Tennessee-based operations will have to be relocated under the Act. These closures and relocations will benefit just one constituency: local independent pharmacies. Yet they will deprive millions of Tennesseans of affordable, convenient access to drugs, requiring them to find new ways to obtain their medicines.

8. The FAIR Rx Act closely resembles Arkansas Act 624, enacted in 2025. Act 624, like the FAIR Rx Act, prohibited PBM-affiliated pharmacies from operating within the state, which lawmakers attempted to justify with reference to the same catch-phrase that appears in the legislative record here: preventing the "fox from guarding the hen house." But a federal court in the Eastern District of Arkansas saw this pretext for what it was, preliminarily enjoining the Arkansas law on the ground that it violates the Commerce Clause. *See Express Scripts, Inc. v. Richmond*, 2025 WL 2111057 (E.D. Ark. July 28, 2025). Tennessee's legislature embraced the Arkansas law in all relevant respects, with supporters openly boasting that the Act "aligns Tennessee with Arkansas Act 624."

9. The FAIR Rx Act should see the same fate. The Court should declare that the Act violates the United States Constitution and is preempted as applied to benefit plans covered by ERISA or offered under Medicare.

10. ***First,*** just like Act 624, the FAIR Rx Act is a paradigm of unconstitutional economic protectionism in violation of the dormant Commerce Clause. The Act targets substantially all out-of-state competitors while shielding in-state pharmacies from competition. The Act's text, legislative history, and practical effect uniformly demonstrate that its

4

principal objective is to protect local independent pharmacies from competition by out-of-state PBM-affiliated pharmacies.

11. The evidence is unequivocal. As originally introduced, the Act would have swept in RxPreferred Benefits, a Tennessee-based PBM owned and operated by local independent pharmacists. But the Tennessee Pharmacists Association—a trade association for independent pharmacies and lead proponent of the Act—worked with bill sponsors to amend the legislation, ensuring that RxPreferred Benefits would be carved out. The amendment bore no relation to the Act's stated purpose and instead reflects a targeted effort to shield favored in-state entities from the Act's effects.

12. The Act's discriminatory line-drawing confirms the same point. Although the Act is drafted to reach pharmacies affiliated with both PBMs and health insurance issuers, its practical effect is to expel out-of-state PBM-affiliated pharmacies—including those affiliated with CVS, Express Scripts, and OptumRx—while protecting local independent pharmacies. Accredo, for example, is a foreign corporation affiliated with Express Scripts that maintains substantial operations in Tennessee. The Act would force Accredo to close or relocate its Tennessee operations, even as it leaves locally owned independent pharmacies untouched.

13. The resulting line the statute draws is clear: Local independent pharmacies and locally-owned PBMs are protected, while pharmacies affiliated with out-of-state companies must unwind their corporate affiliations, or Tennessee will simply force them to close. This kind of overt discrimination against out-of-state companies makes for a straightforward Commerce Clause violation.

14. *Second,* the Act is preempted by the Employee Retirement Income Security Act of 1974 (ERISA). The Act impermissibly regulates a central matter of plan adminis-

5

tration by eliminating key pharmacy network design options that courts have recognized as integral to ERISA plan benefits, forcing plan administrators to create Tennessee-specific carve-outs or restructure pharmacy networks nationwide.

15. *Third*, and for similar reasons, the Act is preempted by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA)—the federal law that created Medicare Part D, the Medicare prescription drug benefit program. The Act regulates prescription drug plans under the Medicare Advantage and Part D programs—plans as to which Congress intended for federal standards to govern exclusively.

16. Without this Court's expeditious intervention, the Act will take effect July 1, 2028. But the steps that PCMA's members must take to comply will begin long before then. Speedy resolution of this case is therefore essential. The Court should grant an expedited judgment holding that the Act is unlawful and may not be enforced.

## PARTIES

17. PCMA is a national trade association organized under Section 501(c)(6) of the Internal Revenue Code and the laws of the state of Delaware. Its institutional mission is to represent the interests of PBMs before lawmakers and in litigation. Its principal place of business is the District of Columbia.

18. PCMA's member companies administer drug benefits for more than 230 million Americans throughout the nation, including in Tennessee. PCMA has over seventy members, including Abarca Health, CarelonRx, CerpassRx, CVS, Express Scripts, Humana Pharmacy Solutions, LucyRx, Maxor Plus, MedImpact Healthcare Systems, Navitus, OptumRx, PerformRx, Prime Therapeutics, ProAct, Progyny, Rx Benefits, RxPact, RxSense, Script Care, Serve You Rx, TrueRx, Vytlone, Waltz Health, and WellDyne.

6

19. Many PCMA members, including CVS, Express Scripts, and OptumRx, are affiliated with health insurance issuers and hold permits and licenses issued by the Tennessee Board of Pharmacy or control or have direct or indirect interests in entities that do. Those members or their corporate affiliates currently operate pharmacies in Tennessee or ship prescriptions to Tennessee patients under Tennessee pharmacy licenses, and they may be denied permits and licenses to continue doing so under the Act.

20. Shanea McKinney, Marlin Blane, David Brown, Jake Bynum, Brooke Mills, Matthew Phillips, Melissa Boruff, Rebecca Leinart, and Nichole Foster are individual members of the Tennessee Board of Pharmacy, which is tasked with enforcing the Act. Each is sued in his or her official capacity.

21. Lucy Shell is the Executive Director of Tennessee Board of Pharmacy. She is sued in her official capacity.

22. Jonathan Skrmetti is the Attorney General of the State of Tennessee. The Attorney General is authorized to enforce the Act. He is sued in his official capacity.

## CAUSE OF ACTION, JURISDICTION, AND VENUE

23. PCMA's cause of action arises under 42 U.S.C. § 1983, the Declaratory Judgment Act (28 U.S.C. §§ 2201-2202), the Supremacy Clause of the U.S. Constitution, and the Court's inherent equitable powers.

24. This complaint arises under and presents questions of federal law. The Court's subject matter jurisdiction is thus invoked under 28 U.S.C. § 1331.

25. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because defendants reside in the district and 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this action occurred in this district.

7

26.   This Court has personal jurisdiction over Defendants because Defendants' principal place of business is within the Middle District of Tennessee.

**STANDING**

27.   Many of PCMA's members will suffer concrete, particularized, and imminent injury in fact if the Act goes into effect. Many of PCMA's members own, operate, control, or direct the operation of retail, mail-order, and specialty pharmacies that hold resident pharmacy permits and non-resident pharmacy licenses issued by the Board of Pharmacy. Without these permits and licenses, these pharmacies cannot dispense prescription drugs in the State. Under the Act, many may lose their resident pharmacy permits and non-resident pharmacy licenses and be forced to cease dispensing drugs in Tennessee.

28.   Pharmacies that must stop operating in the State will lose established business relationships and ongoing revenues. Members that operate affiliated specialty pharmacies will lose access to the Tennessee market for limited-distribution and exclusive-distribution drugs upon which patients with serious conditions depend. The reputational damage and the destruction of longstanding business relationships inflicted by the Act are concrete.

29.   These injuries are traceable to defendants' conduct. Defendants are responsible for administering and enforcing the Act, including through potential denials or revocations of pharmacy permits and licenses, the promulgation of implementing regulations, and referral of violations to the Attorney General for enforcement. Absent the Act, PCMA's members would continue to operate their pharmacies in Tennessee without interruption.

30.   The injuries are also redressable by a favorable decision. A declaratory judgment that the Act is unconstitutional and preempted by federal law, together with a permanent injunction barring Defendants from enforcing the Act, would prevent any denial or

8

revocation of PCMA's members' pharmacy permits and licenses and allow them to continue operating in Tennessee.

31.     The interests at stake in this litigation are germane to PCMA's organizational purpose. PCMA is a national trade association organized under Section 501(c)(6) of the Internal Revenue Code whose institutional mission is to represent the interests of PBMs before lawmakers and in litigation. This suit—challenging a state law that prohibits PCMA's members from operating pharmacies in Tennessee—is squarely within PCMA's core organizational mission of protecting PBMs from discriminatory and unconstitutional state regulation.

32.     Neither the claims asserted nor the relief requested requires the participation of individual PCMA members. PCMA seeks declaratory and injunctive relief on behalf of its members as a class, and neither damages nor other individualized relief is sought. The legal questions presented—whether the Act violates the dormant Commerce Clause, is preempted by ERISA, and is preempted by the Medicare statute—are common to all PCMA members and do not require individualized proof.

## FACTUAL ALLEGATIONS

### A.     PBMs play an indispensable role in administering prescription drug benefits and keeping drugs affordable

33.     The process of manufacturing, distributing, dispensing, and paying for prescription drugs is highly complex and involves a number of different stakeholders. Manufacturers make and bring drugs to market; wholesalers purchase drugs in bulk from the manufacturers and distribute them to pharmacies, doctors, and hospitals; and employers, labor unions, the state and federal government, and other sponsors of prescription-drug benefit plans provide insurance coverage for pharmacy services and prescription drugs.

34. Most Americans obtain prescription drugs with the help of medical insurance plans that include a prescription-drug benefit. The sponsors of these plans are employers, labor unions, and federal, state, and municipal governments.

35. Designing and administering prescription-drug benefit plans is an extraordinarily complex and time-consuming undertaking that plan sponsors cannot realistically undertake on their own. *See PCMA v. District of Columbia*, 613 F.3d 179, 183 (D.C. Cir. 2010). Virtually all sponsors of prescription-drug benefit plans, private and public alike, therefore rely on pharmacy benefit managers, or PBMs, to make recommendations for the design of their benefits, to construct the networks of pharmacies to be used under the plan, to process claims, and to perform other critical benefit-administration functions.

36. PBMs contract with (1) plan sponsors, to help them design and administer prescription-drug benefits for employees and government-program enrollees; (2) manufacturers, to negotiate rebates on behalf of their plan-sponsor clients; and (3) pharmacies, to help plan-sponsor clients create different groupings of "in network" pharmacies under their benefit plans. *See Rutledge v. PCMA*, 592 U.S. 80, 83-84 (2020).

37. This case centers on pharmacies as well as PBMs. Many PBMs, including many of PCMA's members, own or have indirect interests in pharmacies. PBM pharmacies offer a number of advantages for plan sponsors, making access to prescription drugs more convenient and affordable.

38. Pharmacies today operate in one of three primary formats. A **retail pharmacy** is a brick-and-mortar store that employs one or more behind-the-counter pharmacists to dispense prescription drugs. Retail pharmacies can be standalone operations, or they may sell other goods and services beyond just the dispensing of prescription drugs. Many retail

10

pharmacies are embedded within larger operations, such as large grocery stores or big-box retail stores.

39. Plan sponsors, working with PBMs, typically offer a separate retail pharmacy network where beneficiaries can obtain in-network prescription drugs and services.

40. Many prescription drugs in Tennessee are dispensed and delivered instead by **mail-order pharmacies,** which offer a number of both economic and practical advantages over retail pharmacies, especially for large, multistate plan sponsors. First, mail-order pharmacies have greater purchasing power and lower acquisition costs. They are therefore typically able to deliver drugs at lower cost (and with lower co-pays for enrollees) than in-dependent retail pharmacies, saving both plan sponsors and their enrollees substantial sums of money.

41. Second, mail service improves patient adherence to prescriptions because pa-tients obtain 90-day supplies and do not have to travel to the pharmacy or abide by retail hours. Patients also benefit from automatic shipments and refills, which is especially useful for those who must take regular maintenance drugs. Mail-order pharmacies thus often help improve patient adherence and enhance clinical outcomes, indirectly saving the healthcare system additional costs associated with less effective prescription adherence.

42. Plan sponsors, working with PBMs, typically offer a separate mail-order pharmacy network where beneficiaries can obtain in-network prescription drugs, delivered to their homes or places of work, at lower cost. Often a plan sponsor will elect to have just one mail-order pharmacy in its mail-order pharmacy network, operating uniformly across state lines. When that is so, that pharmacy is typically affiliated with the plan's PBM.

43. The third and final kind of pharmacy at issue here is **specialty pharmacies,** which are responsible for dispensing "specialty" drugs. Specialty drugs are characterized

11

by their greater expense, potency, or sensitivity. Some require special handling, such as refrigeration. Others are highly photo-sensitive, calling for special packaging. These drugs play a significant and expanding role in the treatment for complex diseases like cancer. Today, they account for more than half of overall drug spending.

44.     Specialty pharmacies are expert in dispensing specialty drugs, which require not only specialized handling (due to kinetic, light, or heat sensitivity), but also patient qualification and monitoring requirements. Indeed, many specialty drug manufacturers limit their distribution of specialty drugs to qualified specialty pharmacies only.

45.     Specialty pharmacies have important benefits for cost, access, and quality of care. First, specialty pharmacies can buy specialty drugs in bulk, with better rates for the plan and its beneficiaries. Second, because specialty pharmacies have additional expertise handling, storing, and advising patients on specialty medications, they generally produce better patient outcomes. Such pharmacies are few in number and high in demand, and they dispense predominantly via mail or other common carriers.

46.     Most mail-order and specialty pharmacy services throughout the nation are provided by PBM-affiliated pharmacies. The close relationship that PBMs have with their affiliated mail-order and specialty pharmacies brings numerous benefits. To start, PBMs are able to ensure more effective quality-control and patient-compliance measures with affiliated pharmacies, leading to better outcomes for beneficiaries.

47.     Beyond that, PBMs are able to offer a number of cost-saving plan features and services that would not otherwise be available to plan sponsors without the oversight possible at a PBM pharmacy. For example, when a PBM is able to assure that quality-control procedures are being followed and patient-compliance measures are being implemented, it often can obtain favorable drug acquisition terms from manufacturers, even aside from

12

obtaining lower prices as a result of being able to negotiate at scale. Manufacturers will often warrant the clinical effectiveness of their drugs, for instance—but only when they are given the assurances made possible by PBMs' oversight of affiliated pharmacies.

48. PBMs routinely contract with independent pharmacies when constructing pharmacy networks, ensuring, among other things, compliance with federal and state network adequacy rules. But the cost-saving terms that PBM-affiliated pharmacies achieve are generally not available, or they achieve substantially less savings, when the PBM uses independent pharmacies, over which they have less effective oversight with respect to quality-control and patient-compliance measures.

**B. The Act requires pharmacies affiliated with PBMs and health insurance companies to disaffiliate or cease in-state operations**

49. The Act was introduced as Senate Bill 2040 by Senator Bobby Harshbarger. It was signed into law by Governor Bill Lee on May 22, 2026.

50. Like its Arkansas counterpart, the bill—formally titled the "Freedom, Access, and Integrity in Registered Pharmacy (FAIR Rx) Act"—commences with a series of non-codified recitals reflecting the Tennessee General Assembly's legislative findings. The Act declares that "increasing consolidation of health insurers and pharmacy benefits managers (PBMs) with pharmacies has created conflicts of interest that can restrict patient choice, increase costs, and jeopardize continuity of care." Pub. Ch. 1111, Preamble.

51. The Act further recites the General Assembly's purported concern with "promoting patient choice, preserving pharmacy access, particularly in rural and medically underserved areas, and protecting public health by preventing conflicts of interest that result in inflated costs, reduced transparency, and steering of patients to PBM-owned entities." *Id.* And in language that echoes Arkansas Act 624's non-codified preamble (Act 624

13

§ 1(a)(2)–(3)), the Act asserts that "eliminating the conflict of interest inherent when a pharmacy benefits manager both sets and receives reimbursement, commonly described as the 'fox guarding the hen house,' is necessary to ensure transparent pricing, maintain trust in the pharmacy system, and promote better health outcomes for Tennessee patients." Pub. Ch. 1111, Preamble.

52. In both form and substance, Tennessee's legislative findings parallel Arkansas's non-codified findings—deploying the same rhetoric about PBMs being both a price setter and price taker and the same unsubstantiated accusations of anticompetitive conduct to justify what is, in reality, protectionist legislation designed to shield local independent pharmacies from out-of-state competition.

53. To that end, the Act adds a new section to Title 63 of the Tennessee Code. It provides that "On and after July 1, 2028, a person or entity shall not: (1) Directly or indirectly own, operate, control, or direct the operation of, the whole or any part of a pharmacy; and (2) Directly or indirectly own, operate, control, or direct the operation of, the whole or any part of: (A) A health insurance issuer; and (B) A pharmacy benefits manager." Tenn. Code Ann. § 63-10-3[](b).

54. The Act contains three exceptions. *First,* it appears to allow PBM-affiliated pharmacies to continue dispensing FDA-designated, limited-distribution orphan drugs or limited-distribution drugs subject to FDA-required REMS. Tenn. Code Ann. § 63-10-3[](d)(3). An "orphan drug" is a pharmaceutical product designated by the FDA under 21 U.S.C. § 360bb for the treatment of a rare disease or condition affecting fewer than 200,000 persons in the United States. A "REMS" (Risk Evaluation and Mitigation Strategy) is an FDA-required safety program under 21 U.S.C. § 355-1 that imposes conditions on a drug's distribution to ensure that the benefits of the medication outweigh its risks,

14

often restricting which pharmacies may dispense the drug.

55.    It is unclear how these orphan-drug and REMS-drug carveouts will work as a practical matter. Tennessee law does not permit the Board to issue pharmacy permits or licenses on a drug-by-drug basis or any other limited-use basis.

56.    ***Second,*** the Act does not prohibit an employer from owning or operating a pharmacy or administering pharmacy benefits solely for its own employees, retirees, and dependents under an employee benefit plan. Tenn. Code Ann. § 63-10-3[](i).

57.    ***Third,*** the Act does not apply to pharmacy services provided pursuant to a contract with the United States government for the administration of a federal healthcare program. Tenn. Code Ann. § 63-10-3[](j). Again, it is unclear how this federal healthcare program carveout will work as a practical matter, as Tennessee law does not permit the Board to issue permits for pharmacy services to only certain entities or persons.

58.    Pharmacies affiliated with a PBM may receive a one-time extension to operate until December 31, 2028, but only if they can demonstrate they are pursuing a "bona fide sale" to an "unaffiliated entity" to the Board's satisfaction. Tenn. Code Ann. § 63-10-3[](e).

59.    The Board of Pharmacy is authorized to promulgate rules to effectuate the Act and may refer potential violations to the Attorney General, who is authorized to enforce the Act. Tenn. Code Ann. § 63-10-3[](f)(1)-(2). Pharmacies in violation are subject to civil penalties of up to $10,000 per violation per day. *Id.* § 63-10-3[](f)(3).

60.    The Act gives the term "pharmacy" the same meaning as it has under Tenn. Code Ann. § 63-10-204, which defines a pharmacy as "a location licensed by this state where drugs are compounded or dispensed under the supervision of a pharmacist, as defined in the rules of the board."

61. Applicants for pharmacy permits or licenses must disclose a complete list of all owners, partners, corporate officers, and board of directors; and the individual signing the application must "certify under oath that the pharmacy for which this application is made complies with requirements set forth in Tennessee laws and regulations." *See* https://perma.cc/759K-MYPY.

62. The practical effect of the Act is to ban entities that also own, operate, control, or direct the operation of a health insurance issuer and a PBM from holding a direct or indirect interest in a pharmacy operating in the State—whether retail, mail-order, or specialty—and to force affected pharmacies either to disaffiliate from their corporate relatives or otherwise cease their in-state operations by July 1, 2028.

**C.** **In both purpose and effect, the Act favors local businesses and discriminates against competition by out-of-state businesses**

63. The text, context, legislative history, and public record of the Act demonstrate that the principal purpose and primary effect of the Act are to protect local, in-state pharmacies from competition by out-of-state, PBM-affiliated pharmacies.

64. The Act was modeled on Arkansas Act 624, following its form and content in most material respects. Indeed, the Tennessee Pharmacists Association (TPA)—an association representing Tennessee local independent pharmacies—complained that competition from PBM-affiliated pharmacies is "accelerating [independent] pharmacy closures" and thus called on lawmakers to "align Tennessee with Arkansas Act 624." TPA, 2026 Legislative Leave Behinds, https://perma.cc/K4XH-R9FA.

65. Tennessee lawmakers learned from Arkansas's experience and were therefore less forthcoming about their objective to protect local pharmacies against competition from out of state. Senator Harshbarger, the Act's author and chief proponent—a man who

16

manages his own independent pharmacy, while at the same time he complains of conflicts of interest—said he had studied Arkansas's approach and the resulting litigation to identify ways Tennessee could achieve the same outcome without the same Commerce Clause risks that sank Arkansas's Act 624. *See* Jeff Keeling, Crowe decries 'dark money' ads calling him out on pharmacy bill, WJHL TRI-CITIES (Apr. 8, 2026), https://perma.cc/LU34-3LFV (quoting Senator Harshbarger as stating that he "tr[ied] to learn from what Arkansas has done," studying the Arkansas litigation to determine whether "there [were] potential loopholes" that Tennessee could use to achieve the same result).

66.     Not everyone got the memo:

a.     House Speaker Cameron Sexton, for example, urged his colleagues to support the Act because it would "protect independent pharmacies in [their] community" and "keep independents in business." Robert Schmad, Tennessee lawmakers push bill that could make them, and their donors, richer by triggering CVS closures, *Washington Examiner* (Mar. 10, 2026), https://perma.cc/F7N6-T6XJ.

b.     Representative Monty Fritts called the law a "good way to stand up for [Tennessee's] small independent pharmacies." House Floor Session—63rd Legislative Day Apr 21, 2026, 1:27:30–1:27:35, https://perma.cc/SM3N-M5D2.

c.     Representative Robert Stevens likewise said that the bill was targeted at "out of state company[ies]" and that "the crux of [the] legislation" is "to protect local pharmacies and punish the big ones." *Id.* at 1:28:51–1:29:05.

d.     Senator Ken Yager declared that the bill was a "solution to a problem that PBMs created themselves" and urged his colleagues to vote yes on the bill as a "vote for independent pharmacies." Senate Session—57th Legislative Day Apr 20, 2026, 1:28:19–1:28:37, https://perma.cc/EN9P-HYHG.

17

e.      U.S. Representative Diana Harshbarger, who is Senator Harshbarger's mother, likewise tweeted in support of the bill: "It's time we protect our local independent pharmacies, and I'm working to get it done." Rep. Diana Harshbarger, Tweet on April 29, 2026, https://perma.cc/K5SA-WD8P; https://perma.cc/6LBA-7B8Z.

f.      And TPA's CEO, Anthony Pudlo, remarked on a podcast that other states could replicate Tennessee's approach by electing "a lot of pharmacists" or "spouses of pharmacists" to the General Assembly, because the independent pharmacists in Tennessee's legislature were the "key champions" who made the "stars align" for the Act's passage. Independent Rx Forum, Unmaking the Middleman: Tennessee's Fair Rx Act, Spotify (May 5, 2026) (statement of Anthony Pudlo).

67.      Several sponsors of the Act have direct ties to independent pharmacies and have received significant campaign contributions from the TPA. Senator Harshbarger manages his family's independent pharmacy. Senator Reeves owns a healthcare company that dispenses infused drugs and competes with CVS pharmacies. The spouse of Representative Scarbrough, the lead House sponsor, co-owns a drug store near a CVS pharmacy.

68.      Lawmakers drafted the Act to block competition from out-of-state PBMs and their pharmacies while protecting favored in-state interests. Indeed, no Tennessee-domiciled company will, under the Act, lose the privilege to operate in the State. Only out-of-state companies will. And the Act's addition of the health-insurance-issuer trigger protected RxPreferred Benefits—the sole in-state PBM owned and operated by local independent pharmacists—even though RxPreferred Benefits presents the same supposed conflict of interest that the Act purports to address.

69.      Tennessee's existing regulatory regime confirms the pretextual nature of the Act's purported justifications. Tennessee already has an extensive PBM regulatory regime

18

aimed at the purported conflicts of interest that the FAIR Rx Act was adopted to prevent. Moreover, the legislative record does not show that lawmakers believed the Act was needed to fill any specific gap in that regime. Among other things:

a. Tennessee law prohibits PBMs from giving preferential reimbursements to affiliated pharmacies, requiring that non-affiliated pharmacies receive the same reimbursement as affiliated pharmacies. Tenn. Code Ann. § 56-7-3118(d).

b. It prohibits PBMs from implementing plan designs that require or incentivize patients to utilize an affiliated pharmacy. Tenn. Code Ann. § 56-7-3120(b).[1]

c. Tennessee law also sets price floors for reimbursement, requiring PBMs to reimburse all pharmacies an amount at least equal to the actual cost of dispensing. Tenn. Code Ann. § 56-7-3206(c)(1).

d. It also requires minimum dispensing fees for smaller pharmacies, principally local independent pharmacies. *Id.* § 56-7-3206(b), (f).

70. Given this pervasive regulatory scheme, and the absence of evidence that lawmakers believed the FAIR Rx Act was needed to address a specific regulatory gap, the Act's asserted justifications are pretextual. The real purpose is the protection of in-state companies at the expense of out-of-state companies.

71. The Act is also discriminatory not only in express purpose, but also actual effect. All of the pharmacies that will lose their licenses under the Act are domiciled outside of the state and are owned by out-of-state companies. Consistent with the Act's

---

[1] The Sixth Circuit recently held in *McKee Foods Corp. v. BFP Inc.*, 173 F.4th 242 (6th Cir. 2026), that certain elements of its PBM regulatory regime are preempted by ERISA, including Section 56-7-3120(b). That holding leaves unaffected regulators' ability to enforce Section 56-7-3120(b) against fully-funded plans (which are covered by ERISA's saving clause) and non-ERISA plans, including Medicare and Medicaid plans.

discriminatory purpose, those companies will have to shutter or sell their in-state pharmacies if the Act is allowed to come into effect. Meanwhile, in-state independent pharmacies will reap the benefits, obtaining millions of new customers and billions of dollars annually in new revenues as out-of-state pharmacies are forced to decamp from Tennessee.

## CAUSES OF ACTION

### Count 1: Commerce Clause Violation

72. Plaintiff incorporates and re-alleges all preceding paragraphs as if fully set forth herein.

73. The Act is a clearcut example of unconstitutional economic protectionism, violating the foundational constitutional rule that states may not enact laws to benefit in-state economic interests by burdening out-of-state competitors. This principle is reflected in the negative aspect of the Commerce Clause, which safeguards the national economic union and prohibits states from unjustifiably discriminating against interstate commerce.

74. "[S]tate laws offend the Commerce Clause when they seek to build up domestic commerce through burdens upon the industry and business of other States." *National Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (cleaned up) (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1880)). The Commerce Clause thus "prohibits the enforcement of state laws 'driven by . . . economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Id.* (quoting *Department of Revenue of Kentucky v. Davis*, 553 U.S. 328, 337–338 (2008)).

75. Dormant Commerce Clause challenges implicate a two-step inquiry. *Truesdell v. Friedlander*, 80 F.4th 762, 768 (6th Cir. 2023). "At step one, a court must ask if a challenged state law 'discriminates' against out-of-state economic interests to benefit local

20

economic interests." *Id.* (quoting *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994)). A law is discriminatory in this sense when it gives "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems Inc. v. Department of Environmental Quality*, 511 U.S. 93, 99 (1994). This "'antidiscrimination rule' represents 'the core' principle of the Court's 'dormant Commerce Clause jurisprudence.'" *Friedlander*, 80 F.4th at 768 (quoting *National Pork Producers Council v. Ross*, 598 U.S. 356, 377 (2023)). So if a law discriminates, the courts will "almost always" find it invalid, *Garber v. Menendez*, 888 F.3d 839, 843 (6th Cir. 2018), and States must meet a demanding test to save it, *see Tenn. Wine & Spirits Retailers Association v. Thomas*, 139 S. Ct. 2449, 2461 (2019); *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 802 (6th Cir. 2005).

76. If a law does not discriminate in this way, a court must ask at step two whether it nevertheless inflicts a "substantial harm" on interstate commerce. *National Pork Producers*, 598 U.S. at 384–86. If so, the law may still violate the Commerce Clause if its interstate "burden[s] . . . clearly" exceed its "local benefits" under a benefits-burdens balancing test of *Pike v. Bruce Church*, 397 U.S. 137, 142 (1970).

77. The Act discriminates against interstate commerce in its purpose. The legislative history and public record indicate that the Act was adopted to protect local independent pharmacies from out-of-state competition. Legislators boasted that the Act would align Tennessee with Arkansas's enjoined law, and key sponsors maintained personal financial ties to independent pharmacies. Although lawmakers appear to have been coached to refer to the law as an effort only to ban "vertical integration" as a "business model," a number of lawmakers were forthright with the real purpose: local protectionism.

78.     Even if that were not so, express purpose is not the only (or even traditionally the principal) basis for a successful commerce clause challenge. "Whether a law discriminates in explicit terms against out-of-state goods, or does so merely 'in effect,' the result is the same." *Foresight Coal Sales, LLC v. Chandler*, 60 F.4th 288, 297 (6th Cir. 2023).

79.     The Act discriminates against interstate commerce in its effect. The Act targets substantially all out-of-state competitors relative to in-state competitors, with limited carve-outs for independent pharmacies that are inherently local and thus unaffected. The Act was amended to add a health-insurance-issuer trigger that protects the sole in-state PBM, RxPreferred Benefits, ensuring that pharmacies affiliated with out-of-state PBMs and health insurance issuers are expelled from Tennessee while the only in-state PBM is spared. As Tennessee patients who previously relied on affected pharmacies shift their business to in-state independent pharmacies, local companies will do better—not because they are winning new business based on superior service or lower prices, but because Tennessee lawmakers have simply expelled out-of-state companies from the market. This is straightforwardly differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.

80.     Accredo's situation further illustrates the Act's discriminatory reach. Accredo is a foreign corporation headquartered in St. Louis, Missouri that maintains operations in Memphis, Tennessee. It is a subsidiary of Express Scripts—an out-of-state PBM. Like CVS retail stores, Accredo is owned by an out-of-state company and is only physically present in Tennessee. Accredo is thus properly characterized as an out-of-state enterprise for purposes of the dormant Commerce Clause analysis, and its expulsion from Tennessee—alongside every other PBM-affiliated pharmacy—confirms that the Act targets out-of-state companies while leaving locally owned independent pharmacies untouched. That

22

some out-of-state pharmacies may continue operating in Tennessee cannot erase the "much greater disadvantages that [the law] imposes on out-of-state [companies]." *Family Wine-makers of California v. Jenkins*, 592 F.3d 1, 13 (1st Cir. 2010).

81. By purpose and design, and in practice and effect, the Act applies only to, and thus discriminates against, out-of-state companies. All affected mail-order and specialty pharmacies that may lose operating permits or licenses are based outside of Tennessee and, with the exception of Accredo, ship drugs into the State. More generally, no company that will lose or be denied a permit or license by the Act is domiciled or headquartered in Tennessee.

82. The Act also fails the *Pike* balancing test. The Act imposes an enormous burden on interstate commerce by forcing affected pharmacies to close, divest, relocate, or relinquish Tennessee operating authority, disrupting care for millions of Tennesseans, and eliminating thousands of jobs. This immense burden is not justified by the Act's putative local benefits, because those aims could easily be promoted with a lesser impact on interstate activities. Indeed, Tennessee law already prohibits PBMs from reimbursing affiliated pharmacies at rates different from non-affiliated pharmacies and prohibits steering patients to affiliated pharmacies. Tennessee's reliance on a heavy-handed ban affecting pharmacies affiliated with out-of-state PBMs and health insurance issuers when it has nondiscriminatory and tailored alternatives already in place confirms that Tennessee's true goal was to shore up its local pharmaceutical industry at the expense of out-of-state competitors.

83. Because the Act discriminates against interstate commerce in its purpose and effect and imposes burdens on interstate commerce that are vastly disproportionate to any local benefits, it violates the dormant Commerce Clause and must be declared unlawful and its enforcement enjoined.

## Count 2: ERISA Preemption

84. Plaintiff incorporates and re-alleges all preceding paragraphs as if fully set forth herein.

85. Congress enacted ERISA to ensure that employers sponsoring benefit plans for a workforce spread across multiple states can administer those plans on a uniform, nationwide basis without being subjected to a patchwork of inconsistent state regulations. To that end, Section 514(a) of ERISA expressly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a).

86. A state law "relates to" an ERISA plan if it either has a "connection with" or bears a "reference to" such plans. *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 96–97 (1983). The "connection with" inquiry focuses on whether the state law implicates an area of "core ERISA concern," including laws that dictate benefit structure or design, govern central matters of plan administration, or otherwise undermine the ability of multi-state employers to maintain nationally uniform benefits. *See Egelhoff v. Egelhoff*, 532 U.S. 141, 147–148 (2001); *Gobeille v. Liberty Mutual Insurance*, 577 U.S. 312, 320–21 (2016). The "reference to" inquiry focuses on whether the state singles out ERISA plans for different treatment or depends on the existence of an ERISA plan to operate. *See Mackey v. Lanier Collection Agency & Services*, 486 U.S. 825, 829–30 (1988); *Shaw*, 463 U.S. at 96–97.

87. A state law need not regulate ERISA plans directly to be preempted; it is enough that the law in practice dictates benefit design or "interferes with nationally uniform plan administration" (giving rise to connection-with preemption) or that the existence of ERISA-covered plans is essential to the law's operation (giving rise to reference-to preemption). *Rutledge v. PCMA*, 592 U.S. 80, 86–87 (2020).

24

88. **The Act has an impermissible connection with ERISA plans.** To be sure, states have broad authority to regulate provider licensing. General licensing and permitting laws concern the requirements to become licensed to practice pharmacy, including business requirements and standards for physical facilities and staffing, refrigeration, secure storage for prescription drugs, and the like. But states cannot use such laws as a back door for regulations that, if adopted directly, would be preempted.

89. That is what the Act does. For all the same reasons Tennessee adopted the Act, states across the country have attempted for decades to prevent ERISA-covered prescription-drug benefit plans from shaping pharmacy networks to include or encourage the use of PBM-affiliated pharmacies. But because the design and structure of a plan's network is essential to the design and structure of the benefit itself, courts have held such laws preempted as applied to ERISA-covered plans. *See McKee Foods*, 173 F.4th at 264; *PCMA v. Mulready*, 78 F.4th 1183, 1198 (10th Cir. 2023).

90. The design and structure of a plan's pharmacy networks—including its retail, mail-order, and specialty networks—are a core element of benefit design. The choice of pharmacy network size and composition lies with the plan sponsor and is one of the principal levers through which sponsors control prescription drug costs and offer competitive benefits to employees. And employers and other ERISA plan sponsors often choose to design their networks using PBM-affiliated pharmacies.

91. Sections 2(i) and 2(j) of the Act allow some but not all plans to continue using such network design tools. Employers that operate pharmacies for their own employees will be granted permits under paragraph (i) to continue providing those services, despite triggering all the same conflict-of-interest objections used pretextually to justify the Act. And the federal government, which retains Express Scripts to administer the TRICARE

25

prescription drug benefit program, likewise is permitted by paragraph (j) to continue designing provider networks that use (and *encourage* the use) of PBM-affiliated pharmacies. But all other sponsors of benefit plans are barred by a supposed licensing law from using those same network design tools.

92. This is not a traditional licensing or permitting law. Rather, it is a regulation of network design. The Act expressly dictates who may and may not use network design tools that depend on pharmacy affiliation with PBMs. As a consequence, multistate plans that use PBM-affiliated mail-order pharmacy networks or PBM-affiliated retail locations will have to create Tennessee-specific carve-outs or rearrange their pharmacy networks to meet Tennessee's outlier requirements. Tennessee could not achieve this objective directly through regulation of benefit design; neither can it achieve it indirectly by attaching conditions on pharmacy permits and licenses. Simply put, the Act is an impermissible intrusion on the plan sponsor's discretion to shape benefits for its employees as it sees fit.

93. Not only does it interfere with sponsors' control over network design, but the Act interferes with substantive plan benefits, drug coverage decisions, and formulary administration. Certain drugs that Tennesseans rely on are distributed exclusively by PBM-affiliated pharmacies. By barring such pharmacies from providing services to *some* plans and not others, Tennessee law is also effectively dictating which plans may cover which drugs and forcing ERISA plans to modify drug benefits, coverage decisions, formularies, or Tennessee-specific plan terms to accommodate the Act.

94. **The Act also bears an impermissible reference to ERISA plans.** A state law impermissibly "refers to" ERISA plans where it "singles out ERISA employee welfare benefit plans for different treatment" by express incorporation of ERISA-specific terminology. *See Mackey*, 486 U.S. at 829–30; *Shaw*, 463 U.S. at 96–97.

95.     Once again, § 2(i) of the Act carves out from the law's prohibition any "employer . . . owning or operating a pharmacy or administering pharmacy benefits solely for its own employees, retirees, and dependents under an employee benefit plan." The phrase "employee benefit plan" is the term of art that ERISA itself uses to define the scope of its regulatory regime. *See* 29 U.S.C. § 1002(3).

96.     By keying the boundaries of the paragraph (i) carveout to whether an entity administers benefits "under an employee benefit plan," the General Assembly drew a regulatory line that runs directly through the ERISA statutory framework—granting a narrow exemption for captive employer pharmacies while subjecting the far more common arrangement (in which plan sponsors contract with PBMs to deliver benefits through affiliated pharmacy networks) to the full force of the ban. Simply put, § 2(i) has no operation without the existence of ERISA-covered benefit plans. The legislative choice to calibrate the Act's reach by reference to ERISA plan relationships independently triggers preemption.

97.     Because the Act intrudes on substantive plan design decisions and makes impermissible reference to ERISA-covered plans, it is preempted by ERISA.

### Count 3: Medicare Preemption

98.     Plaintiff incorporates and re-alleges all preceding paragraphs as if fully set forth herein.

99.     Congress created Medicare Part D in 2003 to provide prescription drug coverage to Medicare beneficiaries aged 65 and older and certain younger individuals with disabilities. In collaboration with the Centers for Medicare and Medicaid Services (CMS), private plan sponsors called Medicare Advantage Organizations (MAOs) offer prescription

drug coverage through Part D prescription drug plans or Medicare Advantage Prescription Drug (MA-PD) plans.

100. MAOs construct provider networks through which the benefits are delivered, similar to private health insurance. To promote innovation and competition, Congress (among other things) expressly prohibited regulators from requiring a plan sponsor "to contract with a particular hospital, physician, or other entity or individual to furnish items and services under this subchapter." 42 U.S.C. § 1395w-24(a)(6)(B)(iii). At the same time, federal regulations prescribe detailed standards for benefit design, including adequacy requirements for pharmacy networks and standards for formulary design, beneficiary cost-sharing, and access to covered drugs.

101. To preserve the uniformity of this federal program, Congress enacted a broad express preemption provision, which specifies that the "standards established under this part shall supersede any state law or regulation (other than state licensing laws or state laws relating to plan solvency)" with respect to MA and Part D plans. 42 U.S.C. §§ 1395w-26(b)(3) (MA-PD plans), 1395w-112(g) (Part D plans). As two circuits have recently held, this provision extends beyond ordinary conflict preemption. The Eighth Circuit has held that Congress "expand[ed] the scope of express Medicare preemption from conflict preemption to field preemption." *PCMA v. Wehbi*, 18 F.4th 956, 970–71 (8th Cir. 2021). And the Tenth Circuit has agreed that "[t]he sweeping Part D preemption clause is akin to field preemption." *PCMA v. Mulready*, 78 F.4th 1183, 1206 (10th Cir. 2023).

102. The Act is preempted by §§ 1395w-26(b)(3) and 1395w-112(g) as applied to Part D and MA-PD plans. The Act bars a class of pharmacies—those affiliated with PBMs and health insurance issuers (including MAOs)—from dispensing prescription drugs in

28

Tennessee, regardless of whether they meet all traditional licensure requirements—*unless* they fall within a legislative carveout for certain plans or services.

103. The result is a restructuring of pharmacy and provider networks for Medicare drug benefits provided in Tennessee. For example, many Part D and MA-PD plans designate PBM-affiliated pharmacies as "preferred pharmacies," where beneficiaries receive lower cost-sharing for covered medications. By preventing these pharmacies from providing services to Part D and MA-PD plans in Tennessee (but not to other plans), the Act deprives Part D and MA-PD plans of the ability to utilize this common network design feature.

104. The Act thus intrudes in a field of regulation—the standards for Part D and MA-PD network design—that Congress reserved exclusively for federal regulators.

105. It is no answer to say that the FAIR Rx Act is a state licensing law exempt from Medicare's express preemption clause. As the Centers for Medicare and Medicaid Services has explained, the exception to preemption for state laws related to licensing is limited to requirements for *becoming* licensed. It does not extend to "requirement[s] that the State might impose . . . as a condition for keeping a State license" if the requirement, enacted on its own, would be preempted. CMS, Establishment of the Medicare Advantage Program, 70 Fed. Reg. 4588, 4664 (Jan. 28, 2005).

106. That is the case here: Tennessee lawmakers may not directly dictate to MAOs that they may not include PBM-affiliated pharmacies in their provider networks, even while allowing other plans to use those pharmacies. Nor may they dictate directly which Medicare plans must cover which drugs or force Medicare plans to make Tennessee-specific drug coverage decisions. That being so, Tennessee may not accomplish those same objectives indirectly by attaching conditions to pharmacy licenses. Federal law requires Part D and MA-PD plans to provide beneficiaries with "convenient access" to covered drugs, 42 U.S.C.

29

§ 1395w-104(b); 42 C.F.R. § 423.120(a), and does not contemplate that a State may override that requirement by excluding an entire class of pharmacies from Part D and MA-PD networks based on their corporate affiliations.

107. Because the Act attempts to regulate a field that Congress has reserved for exclusive federal supervision, it is preempted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays this Court:

a) declare that the Tennessee FAIR Rx Act

- violates the dormant Commerce Clause of the United States Constitution;

- is preempted by the Employee Retirement Income Security Act as applied to ERISA-covered prescription-drug benefit plans;

- is preempted by the Medicare statute as applied to Medicare Part D and MA-PD plans;

b) grant permanent injunctive relief barring defendants and their agents or successors from taking any action to implement or enforce the Tennessee FAIR Rx Act;

c) award plaintiff attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b) and any other applicable provision of law; and

d) award any and all other relief that the Court determines just and proper.

30

Dated: June 15, 2026 Respectfully submitted,

/s/ *Todd Presnell*

Michael B. Kimberly*  Todd Presnell
Linda M. Blair*  Timothy A. Rodriguez
Winston Taylor LLP  Bradley Arant
1901 L Street NW     Boult Cummings LLP
Washington, DC 20036  1221 Broadway
(202) 282-5096  Suite 2400
michael.kimberly@winstontaylor.com  Nashville, TN 37203
linda.blair@winstontaylor.com  (615) 252-2355
tpresnell@bradley.com
trodriguez@bradley.com

Nathaniel R. Lee*
Winston Taylor LLP
2121 North Pearl Street, Suite 900
Dallas, Texas 75201
(214) 453-6500
nathan.lee@winstontaylor.com

\* *pro hac vice* motion forthcoming

31